IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CURTIS BLACKWELL,

       Plaintiff,

v.                                                        CV 09-0377 MCA/WPL

JOHN DENKO, et al.,

       Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

COMES NOW Plaintiff Curtis Blackwell, through his undersigned attorneys, and in response to Defendants' Motion for Summary Judgment ("Motion") (Doc. 77) states that the Motion fails to prove the absence of disputed material facts, and the Court should deny the motion.

**I.     DISPUTED MATERIAL FACTS**

Plaintiff disputes only the following numbered material facts cited in Defendants' Motion. *See* Plaintiff's Exhibit Index for a guide to citations to the record, attached hereto in Exhibit. A, pg. 1.

4.     Plaintiff disputes the description of Level I inspections, including its inclusion of a full cargo inspection. The regulation governing Level I inspections does not authorize any cargo inspection other than a check for safe loading. *See* Ex. I. *See U.S. v. Parker*, 587 F.3d 871, 875 (8th Cir. 2009); 49 C.F.R. § 350.105. To the extent that "full inspection of the truck" implies that inspectors possess unlimited discretion and includes searches of a driver's personal effects, Defendants overstate their authority. *See U.S. v. Knight*, 306 F.3d 534, 535-36 (8th Cir. 2002) (guidelines must limit officer discretion, and

commercial motor carrier administrative searches do not include searches of a driver's personal belongings).

5-6. Plaintiff disputes the claim that Level II and Level III inspections include cargo inspection or verification. The regulation on Level II inspections does not authorize anything except a safe loading check, and the regulation on Level III inspections (Driver Only Inspection) does not authorize any cargo inspection/verification. Ex. I. Cargo inspection/verification is not part of a rule or regulation (Ex. A: Strain dep. 32:1-4) but arguably might be authorized under NMSA § 65-5-1(D). *See U.S. v. Debrew*, 09-CR-2054, MCA, Doc. 131, p. 17-21 (D.N.M. 2009). In actuality, MTD officials inspect or search cargo whenever they want to do so. Ex. A: Lassiter dep. 11:7-21; Strain dep. 27:15-18; Richard dep.18:16-21.

7. Plaintiff disputes the allegation that MTD officials are "scheduled" with regard to inspection levels. The only scheduled level is Level I, the most intrusive inspection. Otherwise, inspectors are free to conduct Level II or III inspections at their sole discretion. *See U.S. v. Davis*, 04-CR-1211, WJ, Doc. 114, page 2, (October 29, 2004) ("[MTD] Inspectors make judgment calls when deciding what level inspection to conduct"). *See also* Ex. A: Richard dep. 12:10-22; Lassiter dep. 17:11-23.

8. Plaintiff disputes the allegation that the decision whether a commercial motor vehicle ("CMV") will be inspected is made while it is traveling down the drive to the inspection station, prior to the time it reaches the window where the inspector stands. According to MTD personnel, the decision to inspect is made at any time up to, and including, the time the driver is observed at the window; sometimes the first time anyone other than the

inspecting officer knows that the CMV is selected for inspection is when the inspector informs the driver at the window. Ex. A: Madrid dep. 13:9-25; Richard dep.13:13-22; Gomez dep.8:16-20; Lassiter dep.15:20 to16:5; Tarango dep. 9:2-18; Montes dep.12:22 to 13:20; Chavez dep. 7:22 to 8:3. *See also* Ex. B: Hall dep. 6:5-13. *See U.S. v. Bernard*, 09-CR-2474, RB, Doc. 90, at pg. 10 (D.N.M. July 19, 2010) ("The Court reserve[d] ruling on the credibility of Officer Strain's testimony as to the decision to select Defendant's rig for inspection.").

9.    Plaintiff disputes the claim that there is a policy directing that CMVs be selected for inspection before reaching the inspection booth. In practice, no such policy exists or is implemented. *See* No. 8, above. Defendants failed to produce any such policy despite Strain's claim that "If [said policy is] in writing, I don't have it with me, but I believe there was an email put out as to that." *See* Motion, at pg. 9; Ex. A: Strain dep. 36:17-24.

10.    Plaintiff disputes the claim that MTD officers receive racial profiling training. In fact, MTD officers receive training on racial discrimination in the workplace.  To the extent they recieve training in racial profiling of suspects, it is largely limited to sessions at their law enforcement academy. Ex.A: Lassiter dep. 6:6 to 8:2; Montes dep. 9:23 to 10:14; Madrid dep. 7:11 to 8:3; Chavez dep. 5:18 to 6: 6; Tarango dep.14:6-16; Gomez dep. 5:11 to 6:3.

12.    Plaintiff disputes the claim that Strain decided to do a Level II inspection on Blackwell's truck before he was able to ascertain Blackwell's ethnicity. Though Strain so testified, additional facts cited herein demonstrate that there is a genuine issue as to the truth of his testimony.  *See* No. 8 above & Plaintiff's Additional Material Facts ("AMF"), ¶ 7(A),

*infra. See also U.S. v. Bernard*, 09-CR-2474, RB, Doc. 90, at pg. 8 & 10.

19.    Plaintiff contests the claim that he called Strain a racist or said he would not have been put out of service if he were not Black. The only comment Blackwell made about race was that Strain was engaged in racial profiling. Ex. C: Blackwell dep. 76:17 to 77:8; 52:11-24.

21.    Plaintiff disputes the claim that Strain explained to Blackwell that he could pay the citation penalty assessment or schedule a court appearance.  *See* AMF, ¶ 1(D).

22.    Plaintiff disputes the allegation that Blackwell agreed to pay the penalty assessment with regard to the citation. *See* AMF ¶ 1(D).

## II.    ADDITIONAL MATERIAL FACTS ("AMF")

The following additional facts, disputed or not, demonstrate that there are genuine issues of material fact which preclude entry of summary judgment for defendants:

1.    Blackwell, age 65 (*See* Ex. D, at pg. 2), a black truck driver with decades of experience in truck driving, has been through Ports of Entry ("POE") countless times. (All numbered citations are to Blackwell deposition found in Exhibit C) 6:1 to 8:20;15:2  to 18:15. Blackwell has never had an experience at a POE comparable to his experience at the Lordsburg POE in August 2008. He had never 1) been made to wait such a long time; 2) had his trailer thoroughly searched; 3) had his cab searched; 4) been accused of doing drugs or drinking; 5) been given field sobriety or breathalyzer tests; 6) been pressured to agree to or contest a citation; or 7) been told by a POE officer that he had a "problem." He never had any encounter with a POE officer who exhibited the confrontational demeanor exhibited by Strain.  99:7 to 10:25; 69:4-13.  Specifically:

4

A.     When Blackwell drove into the Lordsburg POE at about 5 p.m. (Ex. 2 to

Blackwell dep., Ex. C), trucks in front of him were waved through, but he

was stopped by Strain. 21:14 to 23:14; 64:16 to 65:1; 99:7-15. He had to

wait inside for what seemed like an hour while Strain talked on the phone

and looked at paperwork. 23:17 to 24:6.  When the inspection finally

began, Strain told Blackwell to open the trailer doors and stand in a certain

spot while he searched the trailer. 24:16 to 25:1. After the search, and on

Strain's request, Blackwell opened an outside compartment to show his

safety equipment and Strain noticed some beer and liquor. He again

ordered Blackwell to stand in a certain spot while he searched the truck

cab. 25:6-23.  In Blackwell's experience, a cargo inspection or cab search

is not part of a standard inspection.104:11-16.

B.     Strain's demeanor changed once he discovered alcohol.  He confronted

Blackwell by asking him if he had been drinking or doing drugs.

Blackwell understood the question as an accusation and, not having been

drinking or ingesting drugs, firmly denied such activity. 25:24 to 26:4;

34:9 to 35:25; 38,:4-8; 31:16-18; 32:16 to 33:1.   Strain then performed a

field sobriety test, after which he told Blackwell, "you have a problem."

26:5-15. Blackwell concluded that Strain was trying to find some reason

to detain him. 106:4-8; 33:1-6. A breathalyzer test did not detect any

alcohol, which shocked and upset Strain. 41:18-19;101:10-20.

C.     When Blackwell re-entered the MTD office, Strain called other officers'

5

attention to the alcohol and humiliated Blackwell by eliciting laughter from them. 26:16-21; 36:18-24.

  D. Strain presented Blackwell with a citation for having alcohol. Strain became agitated, told Blackwell he did not have time and verbally pressured him for a decision on whether to "sign the ticket or go to court." Strain said if he signed the ticket, he would be pleading guilty. 46:7-9; 26:24 to 27:20; 43:23 to 44:11; 51:7-22. On the back of the citation (Ex. 3 to Blackwell dep.) Blackwell read the words: "Refusal to accept and sign this citation will require that you be detained immediately and held in custody until taken to appear before a judge." He concluded that he would be taken to jail unless he agreed to pay the citation so, in a panic caused by Strain's aggressiveness, he signed it. 27:22 to 28:7; 43:23 to 44:11; 46:17-23; 47:20-25.

  E. Blackwell felt the encounter might have lasted a couple of hours. 38:14-21.

2. Immediately after he was placed out of service, Blackwell stayed at the Lordsburg POE for about 30 minutes, and he noticed two other Black truckers and one White trucker who pulled over in the POE lot and went inside the office. Ex. C: Blackwell dep. 93:11 to 94:7.

3. The next day, Blackwell talked to five other Black CMV drivers who were being detained at the Lordsburg POE. Ex. D & Ex. C: Blackwell dep. 73:11-20. He noticed that only Black CMV drivers were being detained, except for one or two others who were not

Black. Ex. C: Blackwell dep. 75:8 to 76:1; 94:19 to 95:25. The other Black CMV drivers had complaints of discriminatory or unfair treatment by POE officers. Ex. D.

4.      State and federal narcotics agents and federal public defenders, who handle cases arising out of the Lordsburg POE, noticed that persons arrested for possession with intent to distribute drugs at the POE are almost exclusively Black.  Ex. B: Leyva dep. 14:16 to 15:17; 16:4-18; 17:10-15; Watkins dep. 11:5-21; Hanson dep. 8:5-22; 9:8-11; 20:17 to 21:10; Kinsey dep.15:11-17; 16:6-25; 17:11-13; 21:8-17; Apodaca testimony 93:1-7; 100:20 to 101:11.

5.      In late 2006, Drug Enforcement Administration ["DEA"] agent Tinnel Kinsey notified Defendant Tim Labier, a POE supervisor, that racial profiling was occurring at the Lordsburg POE. Ex. B: Kinsey dep.15:11 to 16:25. Other narcotics agents commented to a Lordsburg MTD supervisor on the number Blacks arrested at the POE. Ex. B: Hanson dep.16:13 to 18:5; Watkins dep., 16:1 to 17:23.

6.      DEA supervisor Richard Rosa (Ex. B: Rosa dep. 4:14-19; 5:12-19) met with MTD Major (then Captain) J.J. Salazar about Kinsey's allegation of racial profiling. Salazar claimed Rosa told him that he had looked into the allegation, and his "findings" were that there was no substance to the allegation and there was no racial profiling. Ex. A: Salazar dep. 21:21 to 22:7; 28:7-14; 34:3 to 38:13; 42:1-24.  Salazar did not conduct any investigation into whether racial profiling was occurring. Salazar dep. 42:25 to 43:12. However, Rosa said what he told Salazar was that it was Kinsey's opinion, not the DEA's opinion, that racial profiling was occurring. Rosa said no DEA investigation was conducted into whether racial profiling was occurring, and that the only investigation was an internal

7

DEA personnel inquiry into the propriety of Kinsey's allegation. Ex. B: Rosa dep. 9:20 to 10:12; 11:10 to 12:5; 14:3 to 15:5; 15:21 to 16:21; 18:11-14.

7.      Numerous other Black CMV drivers have had unusual experiences at the Lordsburg POE which, considered as a whole, provide strong circumstantial evidence of racially discriminatory enforcement actions. They include:

>    A.      Mike Hall, a Black CMV driver, was detained on August 16, 2008, the day after Blackwell was stopped. (Cites are to Hall dep., Ex. E) 5:12 to 6:8. When Hall pulled up to the POE window, Strain said, "I remember you," and told Hall to pull over.  6:5-13. Hall recognized Strain because earlier Strain had unjustly given Hall a speeding ticket. 6:19 to 7:21. When Hall was inside the MTD building, he heard a commotion between Strain and another driver (Blackwell). 12:13-1; 9:17 to 11:1.  Blackwell told Strain that he was racially profiling trucks, as Blackwell had not seen one White driver pulled in, and only Black CMV drivers were selected for inspections. 9:19 to 11:1. There were about three other drivers inside the portable POE building, all Black. 11:2-9.  Hall noticed that the only detained drivers were Black. 23:10-23; 11:14-24; 20:20 to 21:7. A few months later, Hall was arrested at the Lordsburg POE, falsely accused of having a suspended license. After he bonded out of jail and returned to the POE, MTD officers admitted that his license was not suspended. 12:19 to 14:25. Hall testified that the Lordsburg POE has a reputation among Black CMV drivers of "they're looking for you," and Black drivers say they

always get hassled at the POE. 15:10-14; 16: 17 to 17:10. Hall believes

profiling exists at the POE, and that he was profiled. 19:10 to 20:19.

B.    Clifton McDaniel, a Black CMV driver, felt he was racially profiled in a

stop at the Lordsburg POE on Feb. 6, 2006.  (All cites are to  McDaniel

dep., Ex. E)  6:23 to 7:5.  During a Level III (driver only) inspection

(44:22-23), the inspector conducted lengthy searches of McDaniel's cab

and trailer after making him wait an extended period. 8:13 to 10:18.

McDaniel was given field sobriety tests and falsely accused of failing

them. 13:8 to 16:6.  He felt he was treated roughly. 63:13. McDaniel was

arrested  for DWI and spent a month in jail, whereupon charges were

dismissed. 18:8-9; 20:14-15; 22:17**.**  McDaniel had been through many

inspections and had never experienced an inspection like this one. 24:2-4;

62:22-24.

C.    Robby Robinson, a Black CMV driver, was detained by Strain at the

Lordsburg POE on Oct. 8, 2006. (Cites are to Robinson dep., Ex. E)  7:12-

14 & Ex. 1 to Robinson deposition. When Robinson asked why Strain was

inspecting the inside of his trailer, Strain became agitated. 9:17 to 10:10;

31:8 -23. Strain ordered Robinson to stand in a certain spot while he

searched his truck and trailer. 11:4-14. When Robinson did not move

quickly enough, Strain reached for his sidearm. 11:15 to 12:24. Strain

searched the cab, and again ordered Robinson to stand in a certain spot.

Robinson objected to the cab search, and Strain again reached for his

sidearm. 14:17 to 16:1; 16:8-10; 17:22 to 18:8. Robinson has been driving CMVs for decades and never experienced anything like this incident. 6:8-21; 19:15-18.  He never had a Level II inspection last so long. 19:19 to 20:5. Strain was not interested in safety, as he did not check for a secure load or safety equipment. 21:12 to 22:9. Only one other CMV driver was detained while Robinson was at the Lordsburg POE.  The other detained CMV driver was also Black. He noted that, with all the trucks coming through, just "two Black folks" [including Robinson] were being detained. 21:2-11. All other vehicles driven by Whites were waved through by MTD officers, even when they had obvious violations. 35:3 to 37:14; 16:19 to 17:21.  Robinson felt violated by the search and has since avoided the Lordsburg POE. 18:9-25.

D.   Elreno Adair, a Black CMV driver, was detained at the Lordsburg POE on the night of March 1, 2007. (Cites are to Adair dep., Ex. E) 6:19-23.; 7:15-17.  After Adair pulled over, he waited 15 minutes. 9:3-6.  Then an officer abruptly ordered him out of his truck and questioned him about his cargo 9:11-20; 35:5-10. One MTD officer ordered him to stand in a certain spot while another searched his cab. 10:5-20. Officers refused an offer to inspect his safety equipment, did no safety inspection and had no interest in vehicle safety. 16:24 to 17:4; 10:21 to 11:9; 12:10-24. MTD officers questioned him about carrying drugs. 11:8-15. He was directed to open the sealed trailer, told to stand in a certain spot, and the trailer was searched.

11:10 to 12:9. Adair was ordered inside the POE building and he noticed

only two other drivers, both Black. 13:16 to 14:2.  One, who was leaving,

had a look of disgust and said, "this is bull." 14:3-8; 41:22-25. Adair

asked the other driver what was "going on," and the other driver pointed

to his hand and said, "this is why I'm here." Adair took the gesture and

comment to mean the driver was referring to his skin color, which was

Black. 14:13-18.  This driver, who also had a look of disgust, said he was

ordered to stop every time he went through the Lordsburg POE. 14:21 to

15:2. During the 30-35 minutes he was there, Adair saw no other drivers

selective for questioning or inspection. 15:15-22. He had never

experienced anything like this in 13 years of driving CMVs.  5:21-22;

16:21-23. He had never had his cab or trailer searched. 11:7; 12:10-11;

52:12-14. Adair felt that the communication was inappropriate, and it was

inappropriate that he was ignored and repeatedly asked if he had drugs.

44:14 to 47:2.  Adair avoids the Lordsburg POE now because he believes

MTD officers targeted him because he is Black. 17:5-16. The POE has a

reputation among Black CMV drivers that MTD officers unjustly search

and question them on account of their race. 18:18 to 19:7.

E.     Michael Flowers, a Black CMV driver, was detained at the Lordsburg

       POE on December 30, 2006. (Cites are to Flowers dep., Ex. E) 7:25 to

       8:13; 137:1-3. Another CMV with a Black driver was also stopped at the

       POE. 11:8-16.  While Flowers was there, a White CMV driver came in

and MTD officers immediately told her that she could leave. 13:2-21. All other trucks were waved through. 18:15 to 19:5. Flowers was falsely accused of driving more than his allotted hours, and one of the MTD officers was "hateful." 12:4-23; 14:1-22; 15:18-19.  After Flowers was told to open his trailer for an inspection, a MTD officer became upset because he opened both doors. 14:1-22; 16:25 to 17:7.  Flowers was repeatedly told to "shut up" by the MTD officers when he asked questions. 19:13-21; 21:21-23; 23:11-12. The trailer and cab were searched/inspected for a lengthy period. 21:1-14; 23:2-12. Officers harassed Flowers about the absence of a seat belt for the passenger seat, even though he had no passenger. 23:13 to 25:20. Officers did not conduct a safety inspection. 26:1-25.  As Flowers was leaving after the 1 ½ hour incident, an officer came out and stopped him because he had an outstanding arrest warrant. 31:25 to 32:5; 29:17 to 30:6. Later, Flowers saw a copy of the warrant and noticed that  the printed fax time showed that MTD officers had a copy of the warrant long before they informed him of it. 34:13-24; 161:3 to 163:15.  Flowers will be stopped at the Lordsburg POE when a group of CMVs he knows to be driven by Whites, and with whom he is traveling, are all waved through by the MTD officer at the inspection booth. 40:9 to 41:3; 42:18 to 43:12.   The Lordsburg POE has a reputation among Black truck drivers for being prejudiced. 49:22 to 51:4.  Flowers has been a CMV driver for 24 years and never had an experience like this incident.

12

4:24 to 5:1; 51:5-9. He believes it was racially motivated. 147:23 to 148:1.

8. Strain is known for his aggressiveness in efforts to interdict drugs. Ex. A, Madrid dep. 11:22 to 12:10; *See U.S. v. Bernard*, 09-CR-2474, RB, Doc. 90, at pg. 8.

9. On the day Blackwell was stopped at the Lordsburg POE, Strain conducted inspections of seven vehicles/drivers -- three Black, three White and two Hispanic. All of the Black CMV drivers underwent more intrusive Level II inspections, while all Whites and one Hispanic underwent less intrusive Level III inspections. Ex. F; Ex. B: Strain dep. 68:18 to 70:7.

10. The MTD investigation into Blackwell's complaint against Strain was cursory and did not comply with MTD standards. MTD Major J.J. Salazar was assigned to conduct the investigation. Ex. A, Salazar dep. 44:9-23. He claimed he could not interview Strain because of regulations, Salazar dep. 47:13-23. He was not interested in talking to the five other Black CMV drivers detained during the time Blackwell was at the Lordsburg POE. Salazar dep. 48:1 to 54:6, Ex. 1 to Salazar deposition. Basically, Salazar only read Strain's and Blackwell's statements and reached a conclusion. 47:13-14; 50:2-4. According to MTD director Forrest Smith and Dept. Of Public Safety Secretary John Denko, under MTD standards, Salazar should have interviewed Strain and other witnesses. Ex. A, Smith dep. 6:16-20; 19:21 to 20:6; 38:4-11; Ex. G: Denko dep. 4:9-12; 22:2 to 23:4; 63:16 to 64:23; 67:24 to 68:6. Salazar also went beyond the scope of his investigation in determining that Blackwell's complaint was unfounded. Ex. A: Smith dep. 18:13 to 19:20.

11. Plaintiff's demographics expert, James Williams, Ph.D., reviewed relevant data and

found that the data is consistent with indications of a racial bias at the Lordsburg POE. Report on Findings. Ex. H.

12.    Dr. Williams reviewed Hidalgo County Detention Center (Lordsburg Jail) booking records from April 7, 2005 to August 19, 2008, and found that 24.3% of the truck drivers arrested by the MTD were Black, while 13% of truckers arrested by other law enforcement agencies were Black. The 2000 U.S. Census shows that 12.2 % of U.S. CMV drivers are Black. Thus, Black truckers were arrested by MTD at almost twice the national figure. Ex. 1 to Ex. F, p. 1-2

13.    In November 2009, Dr. Williams surveyed CMV drivers at truck stops along Interstate 10 in southwest New Mexico. Consistent with the U.S. Census, the survey found that 14.6% of truck drivers on I-10 were Black. Dr. Williams's survey found that, at the Lordsburg POE, 33.3% of Blacks reported being delayed, compared to only 18.3% of non-Blacks. When questioned about the delay, 51.7% of the delayed Black drivers reported inspections or searches as the reason, while only 28.3% of CMV drivers of other races reported such reasons for the delays. Ex. 1 to Ex. H, p. 1-2.

14.    Dr. Williams also surveyed CMV drivers about being stopped on the roadway by MTD officers on I-10 near Lordsburg, as opposed to being delayed at the Lordsburg POE. Unlike results found for the POE, there was no statistically significant difference in the percentage of Black and non-Black truckers who had been stopped on the roadway. Ex. 1 to Ex. H,  p. 3. Williams hypothesized that, unlike the POE, there is less chance of officers reacting to driver race when they initiate a stop on the open road. Ex. 1 to Ex. H, p. 3.

15.     Dr. Williams also examined records of arrests from 2007-2009 by Lordsburg MTD

        officers, including Strain. Results showed that 41.9% of those arrested by MTD at the

        Lordsburg POE were Black, while only 11.8% of those arrested by MTD officers at other

        locations were Black. Ex. 2 to Ex. H, p.1-2.

16.     The records show that, at the Lordsburg POE, 30.6% of the persons arrested by Strain

        were Black, compared to 14.3% of persons arrested by him at other locations. Ex. 2 to

        Ex. H, p. 1-2.

17**.**    None of the deposed MTD personnel stationed at the Lordsburg POE, including

        supervisors, admitted knowledge of the high number and disproportionate percentage of

        Blacks who were being arrested at the POE, and all claimed that this phenomenon was

        never discussed among MTD employees.  Ex. A: Lassiter dep. 21:1 to 22:16; Strain dep.

        57:11 to 58:7; 59:19 to 60:12; Richard dep. 21:6 to 22:4; Madrid dep. 21:4-9; Gomez

        dep. 16:23 to 17:8; Chavez dep. 10:13-17; Montes dep. 12:2-21; Tarango dep. 20:9-18;

        Barrera dep. 9:24 to 10:10; 11:19-25; 12:20 to 17:18; Kerr dep. 10:3 to 11:2; 16:2-16;

        Labier dep. 32:12 to 35:1; Salazar dep. 14:10-12.

18**.**    The "Instructions to Motorist" on the back of the citation Strain gave to Blackwell are

        confusing and unclear, and could lead a reasonable person to conclude that he would be

        taken into custody if he did not sign to agree he would pay the citation. Ex. C: Ex. 3 to

        Blackwell deposition.

## III.    LEGAL STANDARDS

### A.     Summary Judgment Standard

        Summary judgment should be entered only if "[t]here is no genuine issue as to any

material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed R. Civ.

P. 56(c). The party seeking summary judgment has the initial burden of demonstrating through

the evidentiary materials that there is no actual dispute as to any material fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). In determining whether this burden is met, the Court must

view the evidence introduced and all factual inferences from that evidence in the light most

favorable to the party opposing the motion. *Id.* On a summary judgment motion, "[t]he inquiry

performed is the threshold inquiry of determining whether there is a need for a trial – whether, in

other words, there are any genuine factual issues that properly can be resolved only by a finder

of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250 (1986). A "genuine issue" exists where the evidence is of such a

nature that a reasonable jury could return a verdict in favor of the non-moving party as to that

issue. *Id*. at 248-52; *Sports Unlimited, Inc. v. Lankford Enterprises, Inc.*, 275 F.3d 996, 999 (10th

Cir. 2002). An issue of fact is "material" if under the substantive law it is essential to the proper

disposition of the claim. *Anderson*, 477 U.S. at 248.

The summary judgment analysis prohibits a court from conducting a trial by affidavit. *Id.*

at 255. Rather, "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge, whether the judge is

ruling on a motion for summary judgment or for a directed verdict." *Id*.  In deciding a summary

judgment motion, the Court assumes that the evidence of the non-moving party is true, resolves

all doubts against the moving party, construes the evidence in the light most favorable to the

non-moving party, and draws all reasonable inferences in the non-moving party's favor. *See*

*Hunt v. Cromartie*, 526 U.S. 541, 551-52 (1999).

16

**B.**     **Applicable Law**

**1.**     **The Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.**

Plaintiff's claims under the Fourteenth Amendment and 42 U.S.C. § 1983 allege that

Defendants racially profiled Blackwell because he is Black by selecting him and his CMV for an

intrusive and humiliating detention, inspection and search. Classifications on the basis of race

are "seldom relevant to the achievement of any legitimate state interest" and, therefore, "are

deemed to reflect prejudice and antipathy-a view that those in the burdened class are not as

worthy or deserving as others." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)

(quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985)). Accordingly,

classifications based upon race are subject to strict scrutiny under the Fourteenth Amendment

and are sustained only if they are narrowly tailored to serve a compelling state interest. *City of

Cleburne*, 473 U.S. at 440.

Claims for racial profiling, or selective enforcement of the law based on race, against law

enforcement officers are properly brought under the Fourteenth Amendment. *Whren v. United

States*, 517 U.S. 806, 813 (1996). "Racially selective law enforcement violates this nation's

constitutional values at the most fundamental level; indeed, unequal application of criminal law

to white and black persons was one of the central evils addressed by the framers of the

Fourteenth Amendment." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th

Cir. 2003). A selective enforcement claim is not dependent on the reasonableness of an officer's

actions under the Fourth Amendment, *e.g.* whether probable cause existed for the stop, detention

search, citation, etc. *Id.* at 1166. To establish a selective enforcement claim, a plaintiff must

show that 1) the defendant officer's actions had a discriminatory effect and 2) were motivated by

a discriminatory purpose. *U.S. v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006).

"In general, the absence of an overtly discriminatory policy or of direct evidence of police motivation results in most claims being based on statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population." *Marshall*, 345 F.3d at 1168. *See also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 fn. 20 (1977) ("Statistics showing racial or ethnic imbalance are probative ... because such imbalance is often a telltale sign of purposeful discrimination"); *Chavez v. Illinois State Police*, 251 F.3d 612, 637-638 (7th Cir. 2001) (reliable statistical evidence is acceptable proof of discriminatory effect).  The *Marshall* Court, however, also stated that a plaintiff can establish both the effect and intent prongs of a selective enforcement claim by direct evidence of an officer's actions during the relevant incident and from other incidents in which it can be inferred that the officer engaged in racial profiling. *Marshall*, 345 F.3d at 1168.

The discriminatory-purpose element requires a showing that discriminatory intent was a "motivating factor in the decision," to enforce the criminal law against the relevant minority suspect. *Marshall*, 345 F.3d at 1168.  Discriminatory purpose, however, need not be an officer's sole purpose in taking the relevant law enforcement action. *Villanueva v. Carere*, 85 F.3d 481, 485 (10th Cir. 1996). Discriminatory intent can be shown by either direct or circumstantial evidence. *See U.S. v. Deberry*, 430 F.3d 1294, 1299 (10th Cir. 2005) (citation omitted). Direct or circumstantial evidence of a "police officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context." *Marshall*, 345 F.3d at 1168. *See also Kim v. Nash Finch Co.*, 123 F.3d 1046, 1059 (8th Cir. 1997) (reasoning that there will seldom be

"eyewitness" testimony concerning the racially discriminatory mental processes of a police

officer) (citation omitted).  In a selective enforcement claim, "[T]he combination of convincing

anecdotal and statistical evidence is potent." *Coral Constr. Co. v. King County*, 941 F.2d 910,

919 (9th Cir. 1991). Such a discriminatory purpose may be inferred from the totality of the

relevant facts. *Washington v. Davis*, 426 U.S. 229, 242 (1976).[1]

      Defendants cite *U.S. v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001), to claim that

Plaintiff "must make a credible showing that a similarly-situated individual of another race could

have been, but was not, [stopped or] arrested... for the offense for which the Defendant was

[stopped] or arrested." Doc. 77, at pg. 8**.**  Defendants allege that Blackwell's claim fails because

he has not made that showing. *Id*. at pg. 10. The *James* Court relied on *U. S. v. Armstrong*, 517

U.S. 456 (1996), a case of race-based selective prosecution and not enforcement, for this

allegedly applicable legal standard. However, while selective enforcement claims are generally

based on the standards articulated in selective prosecution cases (*See Marshall*, 345 F.3d at

1168), the 10th Circuit and other courts indicate that Plaintiffs are not required to make such a

showing in *civil* challenges to selective law enforcement claims where the relevant enforcement

action is a traffic stop. In *Chavez v. Illinois State Police*, a case involving selective enforcement

during traffic stops and frequently cited in *Marshall* and other cases, the 7th Circuit reasoned:

> We find that, although *Armstrong* is reasonably read to require criminal defendants to
> name an individual who was not prosecuted, the instant case involves police conduct, not
> prosecutorial discretion, and is in a civil, not criminal, context. This case is thus not like

---

[1]  "An invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the *practice* bears more heavily on one race than another." *Farm Labor Organizing Committee v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002) (citation omitted)(emphasis added).

> *Armstrong*. Therefore, plaintiffs do not have to provide the court with the name of an individual who was not stopped; instead they may attempt to use statistics to show that the ISP treated them differently than other motorists who were similarly situated.

*Chavez v. Illinois State Police*,  251 F.3d 612, 640 (7th Cir. 2001).  The selective enforcement standard is different with respect to traffic stops because, "In selective prosecution claims, making a showing of a similarly situated individual is possible. The claimant is dealing with a defined universe of individuals with whom to compare; individuals who were arrested and prosecuted for the same offenses in that jurisdiction or some other jurisdiction." *U.S. v. Duque-Nava*, 315 F. Supp.2d 1144, 1153 (D. Kan. 2004).  *Armstrong* explicitly acknowledged that even though such a evidentiary standard was high, it was acceptable because "[t]he similarly situated requirement does not make a selective-prosecution claim impossible to prove." *Armstrong*, 517 U.S. at 466.

In the context of a challenged traffic stop, however, imposing the similarly situated requirement makes the selective enforcement claim impossible to prove. It would require the stopped driver to make a credible showing that a similarly situated individual was not stopped by officers. *U.S. v. Duque-Nava*, 315 F. Supp.2d at 1154. Such a showing is impossible due to the lack of a defined and readily identifiable group of individuals who are similarly situated, and the nature of automobile traffic.[2]  Indeed, the dynamics surrounding traffic stops are inherently different compared to judicial prosecutions of suspects.

> Would a... [criminal] defendant have to hire an investigator to patrol the same stretch of highway patrolled by the arresting officer, and then observe and record other motorists who present probable cause or reasonable suspicion of violating the same traffic law that

---

[2] Nevertheless Plaintiff has provided proof that Black truck drivers passing through the Lordsburg POE are stopped, inspected, and searched at a much higher rate than truck drivers of other races. Plaintiffs then compared those numbers to national and regional (I-10 in Southern New Mexico) of the racial make up of truck drivers to show their significance. *See* Plaintiff's AMF, ¶¶ 11-15.

was the basis for stopping the defendant? Even if a defendant accomplished that, how could a defendant show the other motorist was in fact similarly situated to the defendant; that the officer had the same opportunity to perceive and evaluate that motorist's driving as the officer had to perceive and evaluate the defendant's driving; and that all of the facts and circumstances that the officer relied on in exercising discretion and selecting the defendant to stop, were the same facts and circumstances presented with the motorist that the officer did not stop?

***

Law enforcement agencies keep records of law enforcement activity. Like many police agencies, the Russell County Sheriff does not record every traffic stop an officer makes. Rather, the only recorded stops are those that result in a written ticket or warning citation. Stops that result in a verbal warning are not recorded. To the extent that there is a record, it often doesn't include pertinent data such as race or ethnicity.

*Id*. at 1155. For this reason, "The Tenth Circuit has indicated that a... [plaintiff or a criminal defendant] ...can demonstrate discriminatory effect by either showing a similarly situated individual, *or* by relying on statistical evidence." *Id.* (emphasis in original). *See also Giron v. Alexander*, 2009 WL 2998946, at 8 (E.D. Ark. Sept. 11, 2009)( "The Court rejects Defendants' contention that Plaintiffs may not prevail on their equal protection claims unless they present evidence that a similarly situated group of individuals of another race was treated more favorably [in a traffic stop]").[3]

Plaintiff has presented to the Court statistics showing that Strain, and the MTD Lordsburg POE as an entity, inspect, search, and delay Black truck drivers at a much higher rate than truck drivers of other races. Plaintiff's AMF, at ¶¶ 13-15. Such statistics are not only relevant and "statistically significant" (*See* Ex. 1 to Ex. H), but reliable. *See* also Doc. 82. Plaintiff's expert witness Dr. Williams found that 41.9% of the arrestees at the Lordsburg POE

---

[3] The *Giron* court also stated, "The Court notes that it appears Plaintiffs may offer some anecdotal evidence of similarly situated persons being treated differently. For example, Plaintiff Carlos Jauregui testified that he has personally seen African American and white drivers with things on their rearview mirror drive by Officer Leath who were not stopped. Plaintiff Francisco Arevalo describes witnessing non-Hispanic drivers with other violations (no mirrors, broken brake lights, etc.) in the vicinity of police officers who were not stopped. The Court offers no opinion at this time on the admissibility and proper use of such evidence, but finds that such evidence is not necessary to prove an equal protection violation." *Giron*, at page 9, fn 24.

were Black, while only 11.8% of those arrested by MTD at other locations were Black. *See* Ex. 2 to Ex. H. At the Lordsburg POE, 30.6% of the truck drivers arrested by Strain were Black, compared to 14.3% of truckers arrested by him at other locations. *Id*. The significance of the different arrest ratios depending upon the location of the stop, the POE versus roving patrol stops, is especially noteworthy. First, as Dr. Williams explains, "(u)nlike stopping at the POE, there is less chance of officers reacting to driver race when officers initiate a stop on a road." Ex. 1, p., 3 of Ex. H. *See also* Ex. H, Williams dep. 34:10-14 ("At the port of entry there is a --you're passing by a window, so there is a visual and interaction with an officer. On the road it will be much less likely for the officer to know race in advance of pulling over a trucker.").

Dr. Williams's survey also found that, at the Lordsburg POE, 33.3% of Black truckers reported being delayed at the POE, compared to only 18.3% of other drivers. When asked about the reasons for delay, 51.7% of the delayed Blacks reported inspections or searches as the reason, while only 28.3% of non-Black drivers reported those reasons for the delay. *See* Ex. H, Williams dep. 53:23 to 54:1 ("(I)t was noticeable that for the African-American truck drivers, they were noticeably more likely to be reporting inspections and searches."). Finally, Dr. Williams analyzed arrest record data from the Hildalgo jail and found that 24.3% of the truck drivers arrested by MTD were Black, compared to 13% arrested by other law enforcement agencies (and compared to the fact that 12.2 to 14.6 % of CMV drivers are Black). Ex. 1 to Ex. H.

While these statistics are significant evidence of discriminatory effect without more, Dr. Williams' three statistical sets showing racial disparities in arrests and delays, and the comparison of arrests by race at the Lordsburg POE and elsewhere, buttress this finding. *See*

*Ruiz v. Johnson*, 37 F.Supp.2d 855, 891 (S.D. Texas 1999) (overruled on other grounds by *Ruiz v. Johnson*, 178 F.3d 385 (5th Cir. 1999) ("[s]tatistical procedures can increase the court's confidence in making inferences from a given set of data..."). The fact that each statistical data set corroborates the findings of the others not only makes Dr. Williams' finding reliable but also demonstrates the pervasive culture of racial discrimination, at least with respect to discriminatory effect, at the Lordsburg POE.[4]

Defendants claim that there is a "strong suggestion" that "a Plaintiff alleging racial profiling must demonstrate that the officer knew the individual's race or skin color before deciding to stop or detain him, and that his decision was motivated in part by the individual's race or skin color." Motion, at pg. 9. Defendants contend that Strain had already selected Blackwell's truck before it arrived at the MTD inspection window, before he could tell Blackwell's race, and that it is policy to select trucks for inspection before trucks arrive at the window. *See* Motion, at pg. 4-5 & ¶¶ 8, 9, & 12. In fact, the layout of the POE allows MTD officers to sometimes see the driver's race as the truck slowly approaches the window. Ex. A: Strain dep. 52:22 to 53:8. Furthermore, drivers are selected for inspection at any time up to, and including, the time they arrive at the window. Disputed Material Facts, *supra* at ¶ 8; *See also U.S. v. Michael*, 2007 U.S. Dist. Lexis 67951, at ¶ 8 (D.N.M. June 22, 2007)(MCA) (finding that at the MTD POE in Gallup, New Mexico, "[O]fficers staffing the credential booth may exercis[e] their discretion in selecting which vehicles to refer to the inspection bay."). In *U.S. v. Bernard*, 09-CR-2474, RB, Doc. 90, in a separate incident that occurred at night, Strain claimed

---

[4] In response to a question regarding the "gist" of his findings, Dr. Williams replied, "[T]he data are what they are. I mean, we document some differentials, there's a pattern of differentials there, there are three different data sets. You know, if I were teaching my sociology class or using it as an illustration, I would say there are race differences in outcomes in three different data sets." Ex. H, Williams dep. 38:17 to 39:6.

23

that he could not tell the race of the driver as the truck approached the inspection booth. *Id*. at pg. 8. Despite Strain's contention otherwise, "The [c]ourt reserve[d] ruling on the credibility of Officer Strain's testimony as to the decision to select Defendant's rig for inspection."  *Id*. at pg. 10. This is especially telling for the determination of whether genuine issues of  material fact exist because, despite Strain's contention that he selected the truck in the *Bernard* case for inspection prior to determining the race of the driver, the Hon. Robert C. Brack did not find the lack of visibility conclusive on the alleged timing of Strain's decision to conduct an inspection. In any event, Blackwell arrived at the POE  at approximately five p.m. (Ex. C: Ex. 2 to Blackwell dep.), during daylight.

Even if the Court determines that Strain selected Blackwell's truck for inspection before he determined his race, Strain knew Blackwell's race when he decided to detain him, search the truck and the cab, perform unwarranted tests to determine if he was intoxicated, effectively accuse him of being impaired, and pressure him to sign the citation. Plaintiff's AMF, ¶ 1. Plaintiff's claims are not limited to, or dependent on, whether Strain knew his race before he decided to select Blackwell's truck for an intrusive inspection. *See, e.g., Marshall*, 345 F.3d at 1169 ("If, as it appears, Officer Porter took steps to determine Mr. Marshall's race after he committed the violation but before the police officer activated his emergency lights, it might reasonably be inferred that Mr. Marshall's race played a part in the decision to initiate the stop").

Strain knew Blackwell's race before he decided which level of inspection to conduct. *See U.S. v. Davis*, 04-CR-1211 (WJ), Doc. 114, at pg. 2 ("[MTD] Inspectors make judgment calls when deciding what level inspection to conduct"). On the day Blackwell was detained, Strain conducted inspections of seven trucks, three of which were driven by Blacks. All Black drivers

underwent Level II inspections, while all but one of the other drivers underwent less intrusive Level III inspections.  Plaintiff's AMF, ¶ 9.  Even though Plaintiff is not required to prove that similarly situated individual non-Blacks were treated differently, the fact that all Blacks drivers inspected by Strain that day were subject to a more intrusive inspection level is evidence thereof and is unquestionably relevant.

Defendants assert that Plaintiff  failed to present any evidence showing discriminatory intent or purpose.  Motion, at pg. 10. First, Defendants fail to acknowledge that circumstantial evidence may be used, and often is the only available evidence, to show intent.[5] *See Marshall*, 345 F.3d at 1168 (Circumstantial evidence of a "police officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context."). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). The impact of the official action (whether it bears more heavily on one race than another) may provide an important starting point in providing sufficient evidence as to an intent to discriminate. *Id*.

In fact, Plaintiff has presented ample evidence permit a juror to conclude, under the totality of the circumstances, that Strain had discriminatory intent when he singled out Blackwell for questioning, inspection, and detention. The manner in which the interaction between Blackwell and Strain occurred is relevant. *See Marshall*, 345 F.3d at 1167-68 (defendant was

---

[5] Summary judgment in this case is partly dependent on subjective intent, which affects the nature of the relevant inquiry into disputed material facts providing circumstantial evidence of state of mind. *McCormick v. Farrar*, 2002 WL 31314681, at 8 (D.Kan. September 27, 2002) (internal quotations omitted).

able to present evidence of the officer's behavior during the events in question). Blackwell

testified that, prior to this incident, he had never been forced to wait for a POE inspection for

such a long time; never had his trailer thoroughly searched; never had his cab searched; never

been accused of during drugs or drinking; never been given field sobriety or breathalyzer tests;

never been pressured to make a decision on a citation, and never encountered a POE official with

the confrontational demeanor Strain exhibited. Plaintiff's AMF, ¶ 1. Also, *after* Strain performed

a sobriety test, he told Blackwell that he "had a problem" (though there is no claim that

Blackwell failed the test). Since Blackwell had not been drinking or using drugs, he understood

Strain's comment to mean that Strain was "trying to find something" to allow him to detain

Blackwell. Plaintiff's AMF, ¶ 1(B).  *See also* Defendant's Closing Argument on Motion to

Suppress (Doc. 115, pages 8-9  in *U.S. v. Debrew*, 09-cr-02054 MCA (D.N.M.)(providing

circumstantial evidence that Strain engaged in conduct that might show propensity to search for

criminal activity based on a feeling of  "something 'is not right," without pointing to specific

articulable facts.).

Strain's actions in other cases provide circumstantial evidence of the presence of

discriminatory intent in enforcement actions he took against Blackwell.

Since December 2005, Officer Strain has been directly involved in the apprehension of
approximately twenty loads of contraband at the Lordsburg Port of Entry. Not all of the
twenty loads have involved black individuals. In the four or five federal prosecutions in
which Officer Strain has testified, all the defendants have been black.
***
Investigator Apodaca [of the Federal Public Defender's Office reviewed the records for
the Federal Public Defender's Office in Las Cruces going back five to six years. The total
number of such cases [where MTD arrested a truck driver] was seventeen. The
defendants were black in sixteen of the seventeen cases.
***
*The statistics in this case are alarming.* Defendants, with Officer Strain's testimony,
have shown that 100% of the defendants in federal court cases in which Officer Strain

26

was directly involved have been black.

*U.S. v. Bernard*, 09-CR-2474, RB, Doc. 90, at pages 8, 9, 13-14 (emphasis added). Judge

Brack's grant of discovery and finding of the "alarming" nature of the statistics involving Strain,

while not admissible in front of a jury, show that when even less circumstantial evidence is

presented about Strain and the Lordsburg POE than presented here, it still supported an inference

of intent to discriminate.  Additionally, other Black truckers testified about their experiences of

discrimination in the form of selective enforcement at the Lordsburg POE.  This testimony, in

the aggregate, provides more than sufficient evidence from which a jury could infer intent to

discriminate. Those truckers and Blackwell had remarkably similar experiences – long waits, cab

and trailer searches, officers more interested in searching than safety, improper and impolite

behavior by officers, treatment as if they were suspects rather than simply truckers being

inspected, noticing that only Blacks were being detained, and false or unsubstantiated

allegations, veiled and overt, of wrongdoing. Plaintiff's AMF, ¶¶ 1 & 7.

        Federal and state narcotics agents, and a federal public defender's office investigator,

present further anecdotal evidence that Strain and other MTD officers selectively enforce laws

and regulations against Black truckers.  Not only did a federal agent outright accuse Lordsburg

MTD POE personnel of racial profiling, but she and other narcotics officers noticed that persons

arrested for serious drug charges at the POE were almost exclusively Black.  A federal public

defender's office investigator confirmed this fact. Plaintiff's AMF, ¶ 4.

        There are disputed material fact with respect to both the effect and  intent elements of

Blackwell's discrimination claim against Strain.  The Court should deny Defendants' Motion.

## 2.    Qualified Immunity Standard

Defendants make the bald assertion that Strain is entitled to qualified immunity because his "actions in conducting enforcement of federal and state laws that Plaintiff admitted to violating certainly did not violate clearly established law in the Tenth Circuit in August, 2008." Motion, at pg. 11.[6]  In fact, Plaintiff has shown that Strain violated clearly established law by selectively enforcing laws or regulations. First, courts apply the clearly established prong of the qualified immunity test in the light most favorable to the party asserting the injury. *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007). Clearly established law holds that it is a violation of the Equal Protection Clause for a police officer to target a person based on the person's race. *U.S. v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993). "[C]laims asserting selective enforcement of a law on the basis of race are properly brought under the Equal Protection Clause, and ... the right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment." *Marshall*, 345 F.3d at 1166.

Blackwell admits to violating federal law banning possession of any alcohol in a CMV, even unopened containers not accessible from inside the truck's cab or trailer, but only after Strain stopped, detained, inspected and searched his truck on account of his race. Defendants inaccurately imply that Strain possesses unfettered discretion to search and inspect trucks at the POE.  Rather, "[A]dministrative searches are an exception to the Fourth Amendment's warrant requirement, but they are not an exception to the Fourth Amendment's requirement for

---

[6] Defendants narrowly define how to determine whether a right was sufficiently clear at the time of the relevant incident to provide notice to a reasonable officer that his or her actions violated that right. "To be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 842 (10th Cir. 2005) (internal citation and quotation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id*.

reasonableness." *Bruce v. Beary*, 498 F.3d 1232 (11th Cir. 2007) (*citing Donovan v. Dewey*, 452 U.S. 594, 598-99 (1981)).  The U.S. Supreme Court confirmed that an officer's discriminatory motivations for pursuing a course of action can give rise to an Equal Protection claim even where there are sufficient objective indicia of suspicion to justify the officer's actions under the Fourth Amendment. *Whren v. U.S.*, 517 U.S. 806, 813 (1996). That is the situation here. Strain is not entitled to qualified immunity given the numerous disputed material facts.

3.      **Supervisory Defendants**

Defendants assert that because Plaintiff's claims against Strain fail, his claims against the supervisory Defendants must also fail. Motion, at pg. 11. Even though this proposition is generally true (*see Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)), Blackwell has shown genuine issues of material fact which permit his claim against Strain to go before a jury.

Defendants appear to allege that, even if Blackwell defeats Strain's summary judgment claims, his claims against the other individual Defendants for failure to properly discipline, train, or supervise still must fail. Motion, at pg. 11. Defendants allege that Blackwell's supervisory liability claims fail because Denko, Smith, and Labier did not personally participate in the deprivation of his rights. However, "personal participation" does not require direct participation, as 42 U.S.C. § 1983 states "any official who *'causes'* a citizen to be deprived of her constitutional rights can also be held liable." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279 (10th Cir. 2008) (emphasis added). Defendants proffer the existence of a policy prohibiting racial profiling and Strain's training on the illegality of such conduct as proof that the supervisory liability claims fail. Motion, at pg. 11. This argument lacks merit.  "Just because the official policy is to decry racial profiling, however, does not automatically mean that defendants

29

are free from reproach." *Chavez v. Illinois State Police*, 251 F.3d at 647.

Defendants do not address Blackwell's claim that the supervisory defendants had a *de facto* custom, practice and policy of ignoring or approving of racial profiling by MTD officer. First Amended Complaint, Doc. 21, par 34. Supervisory liability in the context of Section 1983 actions may be based on a *de facto*, governmental "custom" or "policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  Supervisory officials may be held personally liable for implementing policies, procedures, or customs depriving others of constitutional rights. *In re State Police Litig*., 888 F Supp. 1235, 1254 (D. Conn. 1995).

> Congress included customs and usages within its definition of law in § 1983 because of the persistent and widespread discriminatory practices of state officials in some areas of the post-bellum South... Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law.

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-68 (1970). "'[C]ustom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law."  *Marshall*, 345 F.3d at 1178.

A supervisor is liable under 42 U.S.C. § 1983 if there is an "affirmative link" between the [constitutional] deprivation and  the supervisor. *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir.1988)(citing to *Specht v. Jensen*, 832 F.2d 1516, 1524 (10th Cir. 1987)). This affirmative link has three prongs – personal involvement, sufficient causal connection and culpable state of mind. *Dodds v. Richardson*, --- F.3d ----, 2010 WL 3064002, at pg. 6 (10th Cir. August 6, 2010).  The three prongs are not necessarily distinct. Proof of "knowledge of and acquiescence in a constitutional violation often suffice(s) to meet the personal involvement, causal connection, and deliberate indifference prongs of the affirmative link requirement."  *Id*. Supervisors may be

liable for a subordinate's acts if the supervisor is aware of a pervasive, unreasonable risk of constitutional violation and fails to take action as a result of deliberate indifference or tacit authorization. *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984).

The record here is replete with evidence of the "affirmative link" between the deprivation of Blackwell's rights by Strain and the supervisory Defendants. First, supervisors ignored and did not investigate DEA Agent Kinsey's complaint that Black truckers were being racially profiled at the POE.  MTD supervisors claim that the DEA investigated the allegation, which was untrue.  *See* Plaintiff's AMF, ¶¶ 5 & 6. Simply assuming another entity will investigate a serious complaint from a federal law enforcement officer, rather than investigating it yourself, is clear evidence of knowledge of, and acquiescence to, systemic discrimination and deliberate indifference to constitutional rights.

Second, supervisors never acknowledged that the vast majority of serious drug arrests at the Lordsburg POE were of Black CMV drivers. This head-in-the-sand position is not credible on its face, given that it was common knowledge among non-MTD investigators who handled cases from the POE, as well as the federal public defender's office. Plaintiff's AMF,  ¶ 4. It was the supervisors' job to know about these arrests, as it was their duty to know what arrests are being made by their officers. *See* Ex. B: Watkins dep. 18:1-17. The ethnicity of persons arrested for drugs at the POE is reported regularly. Ex. A, Salazar dep. 15:17 to 16:11. Supervisors have a duty to know what those statistics state when credible allegations are made.

Third, the high number of arrests of Black CMV drivers by MTD, and racial profiling in general, were never discussed by MTD supervisors and their subordinates, and "racial discrimination" training essentially amounted to sessions on workplace discrimination.

Plaintiff's AMF, ¶ 17; Disputed Fact No. 10. In light of what is actually occurring, this amounted to acquiescence to racial profiling.

Fourth, Black truckers who testified about incidents at the POE had remarkably similar experiences – long waits, cab and trailer searches, officers more interested in searching for drugs than safety concerns, improper officer behavior, treatment as if they were criminals rather than simply truckers, detention of only Blacks, and false or unsubstantiated allegations of wrongdoing. Plaintiff's AMF, ¶ 7. Supervisors could not have been unaware of such widespread allegations and treatment.

Fifth, the alarmingly high percentage of Blacks arrested at the POE, particularly when compared to roving patrol arrests and the overall percentage of Black truckers, is powerful evidence of systemic racial discrimination. Arrests are documented in reports, which undoubtedly are available to supervisors. *See* Ex. 2 to Ex. H.

Sixth, the percentage of Black truckers who experienced delays at the Lordsburg POE was almost twice as high as non-Blacks, and Blacks were far more likely than non-Blacks to be delayed by inspections and searches. Plaintiff's AMF, ¶ 14.  This corroborates individual Black CMV drivers' experiences.  Again, since this phenomenon was occurring on a systemic basis, supervisors could not have been unaware.

Finally, the cursory "investigation" into Blackwell's complaint shows the *de facto* policy. The MTD investigator did not even interview Strain, and did not want to interview the other Black truckers who were being detained while Blackwell was at the POE. Salazar read Strain's statement and Blackwell's statement and summarily concluded that no discrimination occurred. Plaintiff's AMF, ¶ 10. Supervisors admitted the inadequacy of this investigation, which was

simply an implementation of the *de facto* policy. *Id.*

All this evidence shows that racial profiling was occurring on a continued, systemic basis at the Lordsburg POE. Despite their head-in-the-sand approach, supervisors could not have been unaware of the situation. Pretending racial profiling did not exist, and ignoring all indications thereof (including an accusation by a federal officer) effectively, and in practice, sanctions and approves racial profiling.

The evidence creates a genuine issue of fact as to whether the supervisory Defendants had knowledge of, and acquiesced in, the *de facto* policy or custom of racial discrimination at the Lordsburg POE. Thus, Defendants' Motion should be denied.

**4.      New Mexico Tort Claims Act.**

Defendants claim, without elaboration, that Plaintiff's state law claims must fail because of the same reasons articulated under a qualified immunity standard. Motion, at pg. 12. Defendants falsely assume that the qualified immunity standard applies to claims under the New Mexico Tort Claims Act. *Romero v. Sanchez*, 119 N.M. 690, 696, 895 P.2d 212, 218 (1995) ("Whether the doctrine of qualified immunity protects an official from an action brought under the Tort Claims Act is an open question."). As such, and given the lack of any substantive discussion of such, Defendants are not entitled to summary judgment on Plaintiff's claims under the New Mexico Tort Claims Act.

**5.      The Citation**

Blackwell testified that he was pressured by Strain to make a decision whether to sign the citation. He testified that, based upon the confusing instructions on the back of the citation, he thought he would be taken into custody if he did not sign the citation and agree to pay the fine.

*See* Plaintiff's AMF, ¶ 1(D).  The signature essentially indicates a guilty plea.  To be

constitutionally valid, a guilty plea must be made voluntarily and knowingly.  *U.S. v. Ruiz*, 536

U.S. 622, 629 (2002).  The defendant must be "reasonably informed of the nature of the charges

against him, the factual basis underlying those charges, and the *legal options and alternatives*

that are available." *Finch v. Vaughn*, 67 F.3d 909, 914 (11th Cir. 1995) (emphasis added)

(quotation and citation omitted). *See also People v. Lesh*, 668 P.2d 1362, 1367 (Colo. 1983)

("(B)efore accepting a plea . . . to a misdemeanor or traffic offense, the trial court must be

satisfied that the defendant's decision to acknowledge guilt has been made knowingly and

understandingly."). There is a genuine issue of fact as to whether Blackwell's decision was

constitutionally valid.  Additionally, if the citation is a product of a detention found unlawful

because it was racially discriminatory, then the citation was unlawfully issued.

## CONCLUSION

Since genuine issues of material fact exist, Defendants' Motion for Summary Judgment

(Doc. 77) should be denied.


Respectfully submitted,

LILLEY LAW OFFICES
Michael W. Lilley
1014 S. Main
Las Cruces, NM 88005
(575) 524-7809
(575) 526-2462 (fax)

Michael L. Stout
Law Offices of Michael Stout
910 Lake Tahoe St.
Las Cruces, NM 88007
(575) 524-1471
(575) 647-0408 (fax)

George Bach
Bach & Garcia LLC
300 Central SW, Suite 2000 East
Albuquerque, New Mexico 87102
(505) 899-1030
(505) 899-1051 (fax)

/s/ Brendan K. Egan 8.30.2010
Brendan K. Egan
ROTHSTEIN, DONATELLI, HUGHES DAHLSTROM,
SCHOENBURG & BIENVENU, LLP
1215 Paseo de Peralta
Santa Fe, New Mexico 87501
(505) 988-8004
(505) 982-0307 (fax)

I HEREBY CERTIFY that on August 30, 2010, I filed the foregoing document electronically through the CM/ECF system and caused the following parties and/or counsel to be served electronically through the CM/ECF system:

Cody R. Rogers
2951 Roadrunner Parkway
Las Cruces, NM 88011

/s/ Brendan K. Egan 8.30. 2010
Brendan K. Egan