IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**CURTIS BLACKWELL**,

        Plaintiff,

vs.                                                                                                                          No. CV 09-377 MCA/WPL

**JOHN DENKO**, individually and in his official capacity;
et al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendants' *Motion to Exclude the Testimony and Reports of James Williams Based on His Failure to Meet the Standards Set Forth in Daubert v. Merrill Dow Pharmaceuticals* [Doc. 76]. The Court has considered Defendants' Motion, Plaintiff's Response, [Doc. 82] and Defendants' Reply, [Doc. 92] the testimony of Dr. Williams at the hearing on this matter and the applicable law. The Court is otherwise fully informed. For the reasons that follow, the Court **denies** Defendants' Motion.

**BACKGROUND**

This case arises out of Plaintiff's encounter with Motor Transportation Division ("MTD") Officer Ben Strain at the Lordsburg, New Mexico Port of Entry on August 15, 2008. At the time, Plaintiff was driving a tractor-trailer eastward on I-10. New Mexico law requires all commercial motor carrier vehicles to stop at designated ports of entry. NMSA 1978, § 65-1-11. MTD officers may inspect commercial vehicles and accompanying documentation to determine whether the vehicles, drivers, and car are in compliance with state law. Section 65-5-1. New Mexico has adopted detailed federal safety regulations applicable to commercial motor carriers. 18 N.M.A.C. 2.3.9 to -2.3.17. In addition, New Mexico has adopted inspection criteria

promulgated by the Commercial Vehicle Safety Alliance. *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1209 (10th Cir. 2001). There are three levels of inspections, with a Level I inspection being the most thorough.[1] *Id.* At the time of the events at issue in this case, the Lordsburg Port of Entry consisted of a portable building located near a large dirt parking lot. Officer Strain directed Plaintiff to pull his tractor-trailer out of the line of vehicles waiting to pass on through the port of entry. Officer Strain elected to perform a Level II inspection of Plaintiff's tractor-trailer. During the course of the inspection, the officer discovered an unopened bottle of gin and an unopened pack of beer in a storage compartment. Possession of alcohol under these circumstances was a violation of federal transportation regulations adopted by the State of New Mexico. 18 N.M.A.C. 2.3.12 (adopting 49 C.F.R. Part 392); 49 C.F.R. § 392.5(a)(3). As a mandatory penalty for the violation, Officer Strain ordered Plaintiff to remove his tractor-trailer from service for twenty-four hours. 49 C.F.R. § 392.5(c). Officer Strain also served Plaintiff with a $250 penalty assessment. Plaintiff, who is of African-American ethnicity, alleges that he was subjected to racial profiling by Officer Strain.[2] Officer Strain denies that he was aware of Plaintiff's ethnicity or race when he selected Plaintiff's tractor-trailer for an inspection.

**SUBSTANTIVE LAW OF RACIAL PROFILING**

"Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons

---

[1] Detailed criteria limiting the officer's discretion are essential to the constitutionality of these administrative inspections. *United States v. Steed*, 548 F.3d 961, 967-68 (11th Cir. 2008) (discussing administrative inspection exception to the Fourth Amendment warrant requirement).

[2] Plaintiff's theory of his case is not entirely clear to the Court, but it appears that Plaintiff is claiming that had he been treated the same as the white truckers whose vehicles passed through the POE on August 15, 2008, Officer Strain would not have had occasion to discover the alcohol stored in the compartment of Plaintiff's truck.

was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003). There is ongoing debate as to the prevalence of racial profiling. *Compare* David A. Harris, *The Stories, the Statistics, and the Law: Why "Driving While Black" Matters*, 84 Minn. L. Rev. 265 (1999) *with* Stephen Michelson, *Driving While Black: A Skeptical Note*, 44 Jurimetrics. J. 161 (2004). Our Court of Appeals has outlined what a plaintiff alleging racial profiling must prove:

> The requirements for a claim of racially selective law enforcement draw on what the Supreme Court has called "ordinary equal protection standards." The plaintiff must demonstrate that the defendant's actions [1] had a discriminatory effect and [2] were motivated by a discriminatory purpose. . . . The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision. . . .
>
> In general, the absence of an overtly discriminatory policy or direct evidence of police motivation results in most claims being based on statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population. This requires a reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population.

*Marshall*, 345 F.3d at 1168 (citations omitted).

## *DAUBERT*

Rule 702 imposes a special gatekeeping obligation on this Court to ensure that expert testimony is not admitted at trial unless it is both relevant and reliable. *See Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell-Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). The relevance of such testimony also must be weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. While the Court is not required to consider any particular set of factors or utilize a particular

procedure in making such determination with respect to expert testimony, the Court must make *some* kind of determination on the record in order to demonstrate that it has performed its gatekeeping function.  *See United States v. Velarde*, 214 F.3d 1204, 1209 (10th Cir. 2000); *Goebel v. Denver & Rio Grande W. R.R. Co.*,  215 F.3d 1083, 1088 (10th Cir. 2000).

> The Federal Rules of Evidence provide that:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2000).  The first requirement of this rule is that the expert's specialized knowledge must "assist the trier of fact." Id.  "Rule 702 thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject." United States v.Muldrow, 19 F.3d 1332, 1338 (10th Cir. 1994).

The 2000 amendments to Rule 702 also explicitly state that to be admissible in federal court, expert opinions require not only a reliable methodology but also a sufficient factual basis and a reliable application of the methodology to the facts.  See Johnson vs. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 429 (6th Cir. 2007); United Sates vs. Mamah, 332 F.3d 475, 477-78 (7th Cir. 2003).  A "sufficient factual basis" under Fed. R. Evid. 702 does not necessarily require the facts or data upon which an expert bases his or her opinion to be independently admissible, so long as they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703.

Even where a witness is qualified as an expert and has both a sufficient factual basis and a reliable methodology, the Court's inquiry is not yet at an end.  The Court must also determine

whether or to what extent the witness reliably applied that methodology to the facts at issue in the present case and whether or to what extent the resulting opinions will assist the trier of fact. As noted, our Circuit has interpreted Rule 702 of th Federal Rules of Evidence as requiring a "common-sense inquiry of whether a juror would b able to understand the evidence without specialized knowledge concerning the subject." Muldrow, 19 F.3d at 1338.

In addition to determining whether the expert is qualified to offer an opinion, the Court's gatekeeping function requires the Court to determine whether  (1) the expert's testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Reliability under *Daubert* is determined by looking at whether the reasoning or methodology underlying the testimony is scientifically valid, and relevance is determined by whether that reasoning or methodology properly can be applied to the facts in issue.  *Smith v. Sears Roebuck and Co.*, 232 Fed.Appx. 780, 781 (10th Cir. 2007).

> "Under Rule 702, the district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." In determining whether expert testimony is admissible, the district court generally must first determine whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion. Second, if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*.
>
> Reliability questions may concern the expert's data, method, or his application of the method to the data. The party offering the expert "must show that the method employed by the expert ... is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements." "Under Daubert, any step that renders the expert's analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." In making a reliability determination, "[g]enerally, the district court should focus on an expert's methodology rather than the conclusions it generates."

*United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (citations omitted).

> [A]s to the kinds of factors that might bear on a judge's gatekeeping determination, the Supreme Court has suggested that a court consider: (1) whether a theory has been or can be tested or falsified, (2) whether the theory or technique has been subject to peer review and publication, (3) whether there are known or potential rates of error with regard to specific techniques, and (4) whether the theory or approach has "general acceptance." The Court has made clear, however, that this list is neither definitive nor exhaustive and that a trial judge has wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability. While these factors are most relevant in the context of a new and novel scientific theory-asking if it has been tested, subjected to peer review and publication, etc.-they do provide examples of the general kinds of issues a trial court need probe in light of its purpose of ensuring that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Failure to consider one, or even any, of these factors, albeit suggestive, will not be dispositive of a district court's failure to fulfill its gatekeeping role because that role depends on the underlying factual circumstances of the particular case.

*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004) (citations omitted).

**DISCUSSION**

Defendants argue that Dr. Williams' opinion that his data shows "race based differentials in outcomes" is inadmissible because "it is irrelevant and serves no purpose other than to confuse the issues and unduly prejudice the jury against the defense." [Doc. 76 at 5] The Court disagrees.  Although Dr. Williams' opinion is couched in the terminology of demographers and statisticians, rather than the terminology employed by lawyers, the substance of his opinion is that his data show a discriminatory effect resulting from law enforcement activities by MTD at the Port of Entry.  For example, his data tends to show that Afro-American truckers are subjected to inspections or searches at the POE at a much higher rate than other truckers.   His data also tends to show that when MTD personnel cannot tell the ethnicity of a driver prior to instigating enforcement activity, the percentage of Afro-American truckers subjected to enforcement activity closely corresponds to the percentage of Afro-American truckers on the

road.  Discriminatory effect is one of the two prongs that a plaintiff must to establish to prove that law enforcement activities violated the Equal Protection Clause of the Fourteenth Amendment.  Dr. Williams' testimony therefore relates to a key issue in this case.  Further, although Rule 704 *allows* an expert to give an opinion on ultimate issues, Rule 702 does not *require* that expert opinion testimony embrace an ultimate issue in order for expert opinion to be admissible.  Dr. Williams' testimony is not rendered irrelevant merely because he will not offer an opinion on whether racial profiling is occurring at the POE. Under Rule 702, Dr. Williams' testimony need only address "a fact in issue." As previously noted, the discriminatory effect of the practices and policies in effect at the Port of Entry is a fact in issue.  Plaintiff does not have to make out his entire case against the individual Defendants through Dr. Williams.

      Defendants argue that Dr. Williams is unqualified to offer opinions on racial profiling because he has no prior training or experience in this particular subcategory of demographics. [Doc. 76 at 6]  Generally, as long as an expert has educational and experiential qualifications in the general field that relates to the subject matter of an issue in question, the expert is not required to be a specialist.  4 *Weinstein's Federal Evidence* § 702.04[1][a] at 702-51 to 702-52 (2d. ed. 2010).  "Courts generally do not require that a witness's expertise be precisely matched to the questions at issue."  *Id.* at § 702.04[2].  Dr. Williams' curriculum vita [Doc. 82-1] and his testimony at the *Daubert* hearing establish that he is qualified by knowledge, skill, experience and education to offer opinions on racial demographics.  His lack of prior experience in the specific area of racial profiling merely goes to the weight accorded his opinions and may be inquired into on cross-examination.

      During the *Daubert* hearing, Dr. Williams explained in detail how he came to be involved in this case and how he collected data and developed his opinions. Based upon Dr.

Williams' testimony during the *Daubert* hearing, the Court is satisfied (1) that Dr. Williams' testimony at trial will be based on sufficient facts and data, (2) that he employed reliable, well-established principles and methods of demography, sociology and statistics, and (3) that he reliably applied these principles and methods to the facts of this case.

Defendants' discussion of *United States v. Alcarez-Arellano*, 441 F.3d 1252 (10th Cir. 2006) and *United States v. Mesa-Roche*, 288 F. Supp. 2d 1772 (D. Kan. 2003) is completely unhelpful to the Court. Contrary to Defendants' assertion that the district court in *Mesa-Roche* "excluded" the defendant's statistical evidence as "irrelevant and unreliable," [Doc. 76 at 9] it appears that although the district court in *Mesa-Roche* found the defendant's evidence to be flawed, it nevertheless relied on the defendant's statistical evidence in finding that the defendant in that case had satisfied the discriminatory effects prong of his selective enforcement claim. 288 F. Supp. 2d at 1190 ("Despite these concerns, however, in this case, the Court is convinced that Defendant has established discriminatory effect."). Contrary to Defendants' assertion that the Tenth Circuit rejected the defendant's statistical evidence in *Alcarez-Arellano*, [Doc. 76 at 9] the Court of Appeals found the statistical evidence in *Alcarez-Arellano* to have "substantial appeal," 441 F.3d at 1265, and characterized them as "disturbing," *id.* n.1. The actual basis of decision in *Alcarez-Arellano* was the Tenth Circuit's acceptance of the district court's finding that the decision to stop the defendant had been made by the arresting officer before he knew the defendant's ethnicity, a finding which made it impossible for the defendant to establish the discriminatory purpose prong of his selective enforcement claim.

The Court is not persuaded by Defendant's argument that Dr. Williams selected a fatally-flawed benchmark population. [Doc. 76 at 9-10] The selection of a proper benchmark population clearly is a critical concern in evaluating the reliability of a demographer's

8

methodology. "All studies that seek, to evaluate law enforcement action, must compare the data of actual law enforcement action with some type of 'benchmark data.'" *Mesa-Roche*, 288 F. Supp. 2d at 1180. Dr. Williams relied on census data reporting the nationwide percentage of Afro-American truck drivers, 12.2%, not the percentage Afro-American residents in the vicinity of the Lordsburg Port of Entry. At the *Daubert* hearing, Dr. Williams testified that more recent census data suggests that 13.4% of truckers nationwide are benchmark figure. Dr. Williams surveyed truck-drivers traveling along I-10, confirming that the census figures reasonably corresponded to the number of Afro-American truckers using I-10, which his survey determined to be 14.6% of truckers. The Court concludes that these benchmark figures used by Dr. Williams, while not ideal, are sufficiently reliable.

The testimony of Dr. Williams will assist the trier of fact.

**CONCLUSION**

The Court rejects Defendants' arguments for excluding Dr. Williams' testimony. The Court finds that:

1. Dr. Williams' testimony at trial will be based on sufficient facts and data;

2. Dr. Williams employed reliable, well-established principles and methods of demography, sociology and statistics; and

3. Dr. Williams reliably applied these principles and methods to the facts of this case.

4. Dr. Williams testimony will assist the trier of fact.

**IT IS THEREFORE HEREBY ORDERED** that Defendants' *Motion to Exclude the Testimony and Reports of James Williams Based on His Failure to Meet the Standards Set Forth in Daubert v. Merrill Dow Pharmaceuticals* [Doc. 76] is **denied**.

**SO ORDERED** this **24TH March, 2011.**

_____
M. CHRISTINA ARMIJO
UNITED STATES DISTRICT JUDGE