IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**CURTIS BLACKWELL**,

        Plaintiff,

vs.                                                   No. CV 09-377 MCA/WPL

**JOHN DENKO**, individually and in his official capacity;
et al.,

        Defendants**.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendants' *Motion for Summary Judgment* [Doc. 77]. The Court has considered Defendants' *Motion*, Plaintiff's *Response*, [Doc. 86] and Defendants' *Reply*, [Doc. 102] and the applicable law, and is otherwise fully informed. For the reasons that follow, Defendants' Motion is **granted in part and denied in part**.

## BACKGROUND

This case arises out of Plaintiff's encounter with Motor Transportation Division ("MTD") Officer Ben Strain at the Lordsburg, New Mexico port of entry ("the POE") on August 15, 2008. New Mexico law requires all commercial motor carrier vehicles to stop at designated ports of entry. NMSA 1978, § 65-1-11. MTD officers may inspect commercial vehicles and accompanying documentation to determine whether the vehicles, drivers, and cargo are in compliance with state law. NMSA 1978, § 65-5-1. New Mexico has adopted detailed federal safety regulations applicable to commercial motor carriers. 18 N.M.A.C. 2.3.9 to -2.3.17. In addition, New Mexico has adopted inspection procedures promulgated by the Commercial Vehicle Safety Alliance. *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1209 (10th Cir. 2001).

At the times material to this lawsuit, the POE consisted of a portable building near a large dirt parking lot.  A paved driveway led past the building.  An MTD inspector was stationed inside the building at a window facing the driveway and located at the level of a truck's cab. [Doc. 77-1]  When a vehicle reached the window, the MTD officer would either direct the driver to proceed  without an inspection or direct the driver into the parking lot for an inspection.

MTD officers perform three levels of inspections, with a Level I inspection being the most thorough. [Doc. 88-4 at 3] Officers are scheduled ahead of time for Level I inspections. Those officers not scheduled for Level I inspections exercise their discretion in selecting between Level II and Level III inspections.  Officers have discretion to search the inside of trailers in the course of safe loading and cargo verification inspections.  MTD guidelines do not include a safe loading check as part of a Level III inspection, which the guidelines refer to as a "Driver Only Inspection." [Doc. 88-4 at 3]

Plaintiff, who was driving a tractor-trailer eastward, left I-10 and drove into the POE. Officer Strain directed Plaintiff to pull his tractor-trailer out of line for an inspection. Officer Strain denies that he was aware of Plaintiff's ethnicity when he selected Plaintiff's tractor-trailer for an inspection.  Officer Strain decided that he would perform a Level II inspection of Plaintiff's tractor-trailer. After inspecting the cargo compartment of the trailer, Strain directed Plaintiff to open an outside storage compartment.  During the course of his inspection of the storage compartment, Officer Strain discovered an unopened bottle of gin and an unopened pack of beer.  Possession of alcohol under these circumstances was a violation of federal transportation regulations adopted by the State of New Mexico. 18 N.M.A.C. 2.3.12 (adopting 49 C.F.R. Part 392);  49 C.F.R. § 392.5(a)(3).  As a mandatory penalty for the violation, Officer Strain ordered Plaintiff to remove his tractor-trailer from service for twenty-four hours. 49

C.F.R. § 392.5(c). Officer Strain also served Plaintiff with a $250 penalty assessment.  Plaintiff, who is Black, alleges that he was subjected to racially selective law enforcement by Officer Strain. Defendants deny this allegation.

**APPLICABLE SUMMARY JUDGMENT STANDARD**

Fed. R. Civ. P. 56(a) provides that "[a] party may move for summary judgment, identifying each claim . . . on which summary judgment is sought."  As our Court of Appeals has succinctly stated:

> Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . .the moving party is entitled to a judgment as a matter of law." A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented.

*Adamson v. Multi Community Diversified Serv., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008)."The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment." *Breyers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998). "It is not [the court's] province at the summary judgment stage to weigh the evidence or to make credibility determinations." *Sanders v. Southwestern Bell Telephone, L.P.*, 544 F.3d 1101, 1105-06 (10th Cir. 2008).

**SUBSTANTIVE LAW OF RACIAL PROFILING**

"Racially selective law enforcement violates this nation's constitutional values at the most fundamental level;  indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003).  There is ongoing debate as to the prevalence of racial profiling.  *Compare* David A. Harris, *The Stories, the Statistics, and*

*the Law: Why "Driving While Black" Matters*, 84 Minn. L. Rev. 265 (1999) *with* Stephen Michelson, *Driving While Black: A Skeptical Note*, 44 Jurimetrics. J. 161 (2004).

Our Tenth Circuit Court of Appeals has outlined what a plaintiff alleging racial profiling must prove:

> The requirements for a claim of racially selective law enforcement draw on what the Supreme Court has called "ordinary equal protection standards." The plaintiff must demonstrate that the defendant's actions [1] had a discriminatory effect and [2] were motivated by a discriminatory purpose. . . . The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision. . . .

*Marshall*, 345 F.3d at 1168 (citations omitted).

**DISCUSSION**

**1.     Discriminatory Effect**

The testimony of James Williams, Ph.D, is Plaintiff's principal source of evidence that law enforcement activities by MTD personnel at the POE are having a discriminatory effect on Black truckers. Dr. Williams is prepared to testify that law enforcement activities at the POE produce "raced based differentials in outcomes." [Doc. 82-2 at 12] Dr. Williams' opinion is based on his analysis of data obtained from law enforcement agencies, as well as a survey he conducted in late 2009. [Doc. 76-1] His data tends to show that vehicles operated by Black truckers are subjected to inspections or searches at a much higher rate than vehicles operated by non-Black truckers. [Doc. 76-1 at 3] Further, his data also tends to show that when MTD personnel cannot tell the ethnicity of a driver prior to instigating law enforcement activity, the percentage of Black truckers subjected to enforcement activity closely corresponds to the percentage of Black truckers on the road. [Doc. 76-1 at 3] Dr. Williams reports a significant disparity between the percentage of Black truckers reporting delays due to inspections and

4

searches (51.7%) and the percentage of other truckers reporting delays (28.3%). [Doc. 76-1 at 3] Dr. Williams determined that 30.6% of the arrests by Officer Strain at the POE are Blacks, even though Black truckers make up only 14.6% of the truckers passing through the POE. [Doc. 76-1 at 18]  The data provided by Dr. Williams is easily sufficient to give rise to a genuine issue of material fact as to whether law enforcement activities at the POE are having a racially discriminatory effect.

2.      **Discriminatory Purpose**

Where the conduct of a particular state actor is at issue, a court should consider "all relevant circumstances," including any pattern of racially discriminatory behavior in deciding whether the defendant acted with a discriminatory purpose. *Marshall* at 1168. (quoting *Batson v. Kentucky*, 476 U.S. 79, 96-97) (quotation marks omitted).  Furthermore, the present case is a civil rights lawsuit, not a selective prosecution case in which a criminal defendant is seeking to abate a criminal prosecution.  As a civil plaintiff, Plaintiff is not subject to either an adverse presumption or a heightened burden of proof, *cf. United States v. Armstrong*, 517 U.S. 456, 464-65 (1996) (adopting presumption that prosecutor has not violated the Equal Protection Clause and imposing on criminal defendant seeking discovery from government the burden of presenting "clear evidence to the contrary"), and merely must prove his case by a preponderance of the evidence. Lastly, the Court notes that it is possible for Plaintiff's right to equal protection to have been violated even if the actions of Officer Strain did not violate the Fourth Amendment. *See Marshall*, 345 F.3d at 1166.

Evidence proffered of how the POE operates suggests at least three points at which racial bias can intrude:  (1) when an MTD officer makes the decision to refer a truck for inspection; (2) when the officer decides what level of inspection to perform on a truck that has been selected for

inspection; and (3) when the officer decides how thorough and invasive the inspection will be (e.g., opening boxes to confirm that the cargo conforms to the manifest).  Whether Officer Strain is able to determine the race of a driver prior to deciding to direct a truck out of line is disputed, and the principal evidence supporting Defendants' position is the testimony of Officer Strain [Doc. 77-1 at 7-9] and other MTD personnel,[1] [Doc. 102 at 4-6] which the jury will be free to believe or disbelieve. "[I]t is particularly wrong to base a summary judgment on [the out-of-court averments] of  an interested party on facts. . . known only to him[,] a situation where demeanor evidence might serve as real evidence to persuade a trier or fact to reject his testimony." *Nat'l Aviation Underwriters, Inc., v. Altus Flying Serv., Inc.*, 555 F.2d 778, 784 (10th Cir. 1977) (citations omitted).  Further, there can be no dispute that by the time an MTD Officer begins the inspection of a truck, the officer has had the opportunity to observe the driver's general appearance.

The Court concludes that a reasonable juror could reason as follows based upon Plaintiff's proffered evidence.  Officer Strain is known for aggressively interdicting drugs.  [86-1 at 35] Safety inspections provide Officer Strain with an opportunity to search for drugs.  In particular, Level I and Level II inspections provide Strain with an opportunity to search for  illegal drug shipments in the guise of a safe cargo check. Notwithstanding his denial of racial profiling, Officer Strain has been proceeding on the assumption that Black truckers are more likely than

---

[1]At the November 3, 2010 hearing before the Court, counsel for Defendants conceded in response to questioning by the Court that an observer stationed at the POE would have no way of objectively confirming that an officer had made his or her decision to inspect a particular truck prior to seeing the driver: "Your Honor, I can't think of another contingency that would allow you to determine, other than when you see the vehicle pulling off for an inspection[.] [Y]ou obviously realize that it's been selected, *but as to when the officer makes that decision, I can't think of anything else beside the officer who would be able to tell you that*."

White truckers to be involved in transporting illegal drugs.  Accordingly, Officer Strain selects Black truckers as a group for inspections at a disproportionately higher rate than their representation in the general population of truckers, and the inspections to which he subjects Black truckers are more intrusive than the inspections to which White truckers are subjected. Officer Strain's  practice of selecting Black truckers for more frequent and more intrusive search searches results in a "self-fulfilling prophecy": "Officers [who] engage in profiling will necessarily come into contact with law-breaking members of minority communities far more frequently than with law-breaking whites and thus will view the actions of minority civilians with a presumption of guilt." *Martinez v. Village of Mt. Prospect*,  92 F. Supp.2d 780, 783 (N.D.Ill. 2000);  *see also* Dorothy E. Roberts, *Foreword:  Race, Vagueness, and the Social Meaning of Order-Maintaining Policing*, 89 J. Crim. L. & Criminology, 775, 819 (1999) (observing that "Racial profiling becomes a self-fulfilling prophecy:  targeting Blacks for police surveillance results in higher rates of arrests, reinforcing the presumption of  Black criminality.").

At the POE, Officer Strain arrests Blacks at a rate that is twice their representation in the population of truckers passing through the POE, [Doc. 88-3 at 6] whereas the percentage of Blacks arrested by Officer Strain as the result of patrolling (where, as Dr. Williams hypothesized, it more difficult for Officer Strain to confirm the driver's ethnicity prior to initiating law enforcement activity) closely corresponds to the percentage of Black truckers in the population of truckers passing through the POE.  Further, on the date that Officer Strain encountered Plaintiff, Officer Strain inspected seven trucks.  [Doc. 88-1 at 2] Three of the seven truckers (43%), well in excess of their representation (14.6%) in the population of truckers passing through the POE were Black, [Doc. 88-1 at 2] and *every one of* the Black truckers was subjected to a Level II inspection, which includes a safe loading check. [Doc. 88-1 at 7-8, 10; Doc. 884 at 3] The two truckers who

were White were subjected to Level III inspections. [Doc. 88-1 at 5-6]  Two of the truckers were Hispanic:  one was subjected to a Level III inspection and one was subjected to a Level II inspection. [Doc. 88-1 at 9, 11]

From the foregoing proffered evidence, a reasonable juror could conclude that Officer Strain selects Black truckers for inspections at a disproportionately high rate, and that when Officer Strain has the discretion to determine the level of an inspection, he disproportionately subjects Black truckers to Level II inspections, which include a safe loading check. This conclusion is consistent with Dr. Williams' data tending to show that Black truckers report delays due to inspections and searches much more frequently than truckers who are not Black. [Doc. 76-1 at 3]  The Court is persuaded that on the evidence of record a reasonable juror could find that on August 15, 2008, Officer Strain was motivated by a racially impermissible purpose when he subjected Plaintiff's vehicle to a Level II inspection.

The Court emphasizes that Plaintiff is not required to prove that Officer Strain personally dislikes Blacks;  it is enough if he is shown to have relied on unsupported stereotypes about Blacks--e.g., Black truckers are more likely than White truckers to be engaged in smuggling drugs--in making law enforcement decisions during his encounter with Plaintiff. *See Ferrill v. The Parker Group, Inc.*, 168 F.3d 468, 473 n.7  (11th Cir. 1999) (observing that "ill will, enmity, or hostility are not prerequisites of intentional discrimination").  Therefore, the absence of evidence that Officer Strain engaged in patently racist acts, such as the use of racial slurs, is not dispositive.

The Court concludes that Plaintiff has come forward with evidence sufficient to create genuine issues of material fact as to racially-discriminatory effect and racially discriminatory

purpose.  Defendants' motion for summary judgment will be denied as to Plaintiff's equal protection claim against Officer Strain.

**3.     Supervisory Liability**

In addition to suing Officer Strain, Plaintiff has asserted claims against John Denko, Secretary of the New Mexico Department of Public Safety; Forrest Smith, head of the Motor Transportation Division of the NMDPS; and Tim Labier, the Captain in charge of MTD Division 4, which includes the Lordsburg POE.

The Supreme Court's decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), sets out the controlling substantive standards.  Like the present case, *Iqbal* involved allegations that supervisory officials had violated the plaintiff's right to equal protection, and, therefore, *Iqbal*'s observations are directly applicable to this case.  "[T]he plaintiff must plead and prove that the defendant acted with discriminatory purpose."  *Id.* at 1948.  "[P]urposeful discrimination requires more than 'intent as volition or intent as awareness of consequences.'" *Id.*  Proof of the supervisor's knowledge and acquiescence in a subordinate's use of discriminatory criteria is insufficient to establish an equal protection violation on the part of the supervisor.  *Id.* at 1949.  Under these standards, Plaintiff's proof is woefully inadequate.

First, Plaintiff has not come forward with any evidence establishing that Defendants promulgated, created, or implemented a policy of subjecting Black truckers to disproportionately more frequent or more stringent inspections than those to which non-Blacks are subjected.  Indeed, it is clear from that allegations of Plaintiff's First Amended Complaint that his claims against the supervisory Defendants are based on their alleged failure to prevent racially selective law enforcement by subordinates and not affirmative acts implementing a custom, practice, or policy of racially selective law enforcement. [Doc. 21 at 7]

Second, because Plaintiff is relying on a theory of liability based on Defendants' alleged failure to prevent the unconstitutional racially discriminatory conduct of subordinates, he runs into *Iqbal*'s conclusion that "a supervisor's mere knowledge of his subordinate's discriminatory purpose" is insufficient to establish that the supervisor has committed an equal protection violation. Here, there is no proffered evidence that Defendants Denko and Smith had actual knowledge of discriminatory treatment of Black truckers at the Lordsburg POE. At best, Plaintiff's evidence shows that there was information existing prior to August 15, 2008 that, if examined, would have indicated that law enforcement activities were having a discriminatory effect on Black truckers.[2] Evidence that Defendants Denko and Smith should have known of this discriminatory effect falls well short of *Iqbal*'s requirement of purposeful discrimination.

Plaintiff's evidence with respect to Defendant Labier includes DEA agent Tenille Kinsey's testimony that she told Labier during a December 2006 telephone conversation that racial profiling was occurring at the Lordsburg POE. [Doc. 86-2 at 1] Labier appears to have passed along Kinsey's remarks, as there is evidence that (then) Captain J.J. Salazar contacted Kinsey's supervisor to complain about Kinsey's allegation, [Doc. 86-2 at 11] but Labier does not appear to have conducted his own investigation into Kinsey's allegation. Since Labier was in charge of the Lordsburg POE, and in view of the seriousness of Kinsey's allegation, a jury might find that a reasonable supervisor in Labier's shoes would have personally looked into the possibility that officers under his command were engaging in unlawful racial profiling. The Court is persuaded, however, that as a matter of law Labier's failure to investigate

---

[2]Obviously, the results of Dr. Williams' study, which the Court has found to be highly persuasive evidence of discriminatory effect, did not exist when Plaintiff was detained on August 15, 2008.

Kinsey's allegation is akin to negligence and does not rise to the level of purposeful discrimination. *Iqbal*, 129 S. Ct. at 1949 (rejecting argument that knowledge and acquiescence in a subordinate's use of discriminatory criteria amounts to purposeful discrimination by the supervisor).

Plaintiff also claims that the supervisory Defendants are liable for failure to train Officer Strain in how to avoid discriminatory enforcement of the law. Under *Iqbal*, Plaintiff must prove that the supervisory Defendants' failure to train Officer Strain amounted to purposeful disregard of the equal protection rights of Black truckers. Purposefulness is an extremely demanding state of mind, higher even than deliberate indifference. *Del Raine v. Williford*, 32 F.2d 1024, 1031-32 (7th Cir. 1994). Plaintiff has no evidence that the supervisory Defendants were actually aware of racial profiling by Officer Strain prior to August 15, 2008. Due to the absence of evidence that Defendants had actual knowledge that Officer Strain was engaging in racially selective law enforcement, no reasonable jury could find that Defendants failed to train Officer Strain in purposeful disregard of the equal protection rights of Black truckers such as Plaintiff.

The Court concludes that Plaintiff has failed to come forward with evidence creating a genuine issue of material fact as to whether Defendants Denko, Smith, and Labier engaged purposeful discrimination. Accordingly, the Court will grant summary judgment in favor of these Defendants on Plaintiff's equal protection claim.

**4.    Qualified Immunity**

Qualified immunity involves a two-pronged inquiry: (1) whether the defendant violated a federal constitutional or statutory right and (2) whether the right in question was clearly established. *Hinton v. City of Elwood, Kansas*, 997 F.2d 774, 779-80 (10th Cir. 1993). A court reviewing a qualified immunity claim may consider the two prongs of the qualified immunity

11

analysis in the order that the court in its sound discretion deems most appropriate. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

In its preceding discussion, the Court determined that Plaintiff's evidence gives rise to a genuine issue of material fact as to whether Officer Strain violated Plaintiff's rights by subjecting Plaintiff to racially selective law enforcement. Therefore, Plaintiff has met the first prong of the qualified immunity analysis with respect to his equal protection claim against Officer Strain. Proceeding to the second prong, the Court concludes that Plaintiff's right not to be subjected to racially-selective law enforcement was clearly established on August 15, 2008. *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003). Plaintiff has made a sufficient showing to withstand summary judgment on Officer Strain's defense of qualified immunity.

In its preceding discussion of Plaintiff's equal protection claim against the supervisory Defendants, the Court determined that Plaintiff's evidence is insufficient to give rise to a genuine issue of material fact as to whether these Defendants violated Plaintiff's right to equal protection. Accordingly, Plaintiff has failed to satisfy the first prong of the qualified immunity analysis. Since a plaintiff must meet both two prongs to overcome qualified immunity, Plaintiff's failure to meet the first prong is dispositive, and Defendants Denko, Smith, and Labier are entitled to summary judgment on their defense of qualified immunity with respect to Plaintiff's equal protection claim.

**5.      Plaintiff's Due Process Claim**

Subsequent to the completion of briefing on Defendant's Motion, Plaintiff abandoned his due process claim. [Docs. 165; 166]

**6.      Plaintiff's State Law Claims**

Subsequent to the completion of briefing on Defendants' Motion, a question arose as to whether Plaintiff had included state law claims in the Pre-trial Order. [Doc. 153; 154]  The Court resolved this question by  declining to exercise supplemental jurisdiction over Plaintiff's state law claims. [Doc. 163]  Defendants' motion for summary judgment is therefore moot to the extent it addresses Plaintiff's state law claims.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part.

**WHEREFORE, IT IS HEREBY ORDERED** that Defendants' Motion for Summary [Doc. 77] Judgment is **granted** as to Defendants **John Denko**, **Forrest Smith**, and **Tim Labier**, in their official and individual capacities, and that the First Amended Complaint and this action are dismissed with prejudice as to these Defendants;

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment is **denied** as to Defendant **Ben Strain** and that this case shall proceed to trial of Plaintiff's claim that Defendant Strain violated Plaintiff's right to the equal protection of the laws.

**SO ORDERED, this 24th day of March, 2011.**

_____
**HON. M. CHRISTINA ARMIJO**
**UNITED STATES DISTRICT JUDGE**