IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


**CURTIS BLACKWELL**,

      Plaintiff,

vs.                                                                    No. CV 09-377 MCA/WPL

**BEN STRAIN**, individually and in his official
capacity,

      Defendant.


## ORDER

This case comes before the Court upon Plaintiff's *Motion to Exclude at Trial the
Testimony of Brian L. Withrow*. [Doc. 75]  The Court has considered Defendants' *Response*,
[Doc. 83] Plaintiff's *Reply,* [Doc. 94] the oral arguments and representations of counsel, the
exhibits and the testimony of Brian L. Withrow admitted at the April 4, 2011 hearing, and the
applicable law, and is otherwise fully advised.

## BACKGROUND

This case arises out of Plaintiff's encounter with New Mexico Department of Public
Safety,  Motor Transportation Division ("MTD") Officer Ben Strain at the Lordsburg, New
Mexico Port of Entry on August 15, 2008.   At the time, Plaintiff was driving a tractor-trailer
eastward on I-10.  New Mexico law requires all commercial motor carrier vehicles to stop at
designated ports of entry. NMSA 1978, § 65-1-11.  MTD officers may inspect commercial
vehicles and accompanying documentation to determine whether the vehicles, drivers, and cargo
are in compliance with state law. Section 65-5-1.  New Mexico has adopted detailed federal

safety regulations applicable to commercial motor carriers. 18 N.M.A.C. 2.3.9 to -2.3.17.  In

addition, New Mexico has adopted inspection criteria promulgated by the Commercial Vehicle

Safety Alliance.  *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1209 (10th Cir. 2001).  There

are three levels of inspections, with a Level I inspection being the most thorough.  *Id.*  At the

time of the events at issue in this case, the Lordsburg Port of Entry consisted of  a portable

building located near a large dirt parking lot. Officer Strain directed Plaintiff to pull his tractor-

trailer out of the line of vehicles waiting to pass on through the port of entry.  Officer Strain

denies that he was aware of Plaintiff's ethnicity when he selected Plaintiff's tractor-trailer for an

inspection.  Officer Strain elected to perform a Level II inspection of Plaintiff's tractor-trailer.

During the course of the inspection, Officer Strain discovered an unopened bottle of gin and an

unopened pack of beer in a storage compartment.  Possession of alcohol under these

circumstances was a violation of federal transportation regulations adopted by the State of New

Mexico. 18 N.M.A.C. 2.3.12 (adopting 49 C.F.R. Part 392);  49 C.F.R. § 392.5(a)(3).   As a

mandatory penalty for the violation, Officer Strain ordered Plaintiff to remove his tractor-trailer

from service for twenty-four hours. 49 C.F.R. § 392.5(c). Officer Strain also served Plaintiff

with a $250 penalty assessment.  Plaintiff, who is of African-American ethnicity, alleges that he

was subjected to racially  selective law enforcement by Officer Strain.[1]

**SUBSTANTIVE LAW OF RACIALLY SELECTIVE LAW ENFORCEMENT**

"Racially selective law enforcement violates this nation's constitutional values at the

---

[1]

    Plaintiff's theory of his case is not entirely clear to the Court, but it appears that Plaintiff
is claiming that if Officer Strain had treated Plaintiff the same as the white truckers whose
vehicles passed through the POE on August 15, 2008,  Officer Strain would not have had
occasion to discover the alcohol stored in the compartment of Plaintiff's truck.

most fundamental level;  indeed, unequal application of criminal law to white and black persons

was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall*

*v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003).  There is ongoing

debate as to the prevalence of racial profiling.  *Compare* David A. Harris, *The Stories, the*

*Statistics, and the Law:  Why "Driving While Black" Matters*,  84 Minn. L. Rev. 265 (1999) *with*

Stephen Michelson, *Driving While Black:  A Skeptical Note*, 44 Jurimetrics. J. 161 (2004). Our

Court of Appeals has outlined what a plaintiff alleging racial profiling must prove:

> The requirements for a claim of racially selective law enforcement draw on what the Supreme Court has called "ordinary equal protection standards."  The plaintiff must demonstrate that the defendant's actions [1] had a discriminatory effect and [2] were motivated by a discriminatory purpose.  . . . The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision. . . .
> In general, the absence of an overtly discriminatory policy or direct evidence of police motivation results in most claims being based on statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population.  This requires a reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population.

*Marshall*, 345 F.3d at 1168 (citations omitted).

### *DAUBERT*

The Federal Rules of Evidence provide that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2000). Rule 702 imposes a special gatekeeping obligation on this Court to

3

ensure that expert testimony is not admitted at trial unless it is both relevant and reliable.  *See Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell-Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). The relevance of such testimony also must be weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  While the Court is not required to consider any particular set of factors or utilize a particular procedure in making such determination with respect to expert testimony, the Court must make *some* kind of determination on the record in order to demonstrate that it has performed its gatekeeping function.  *See United States v. Velarde*, 214 F.3d 1204, 1209 (10th Cir. 2000); *Goebel v. Denver & Rio Grande W. R.R. Co.*,  215 F.3d 1083, 1088 (10th Cir. 2000).  In addition to determining whether the expert is qualified to offer an opinion, the Court's gatekeeping function requires the Court to determine whether  (1) the expert's testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.  Reliability under *Daubert* is determined by looking at whether the reasoning or methodology underlying the testimony is scientifically valid, and relevance is determined by whether that reasoning or methodology properly can be applied to the facts in issue.  *Smith v. Sears Roebuck and Co.*, 232 Fed.Appx. 780, 781 (10th Cir. 2007).

> "Under Rule 702, the district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." In determining whether expert testimony is admissible, the district court generally must first determine whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion. Second, if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*.

> Reliability questions may concern the expert's data, method, or his application of the method to the data. The party offering the expert "must show that the method employed by the expert ... is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements." "Under Daubert, any step that renders the expert's analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." In making a reliability determination, "[g]enerally, the district court should focus on an expert's methodology rather than the conclusions it generates."

*United States v. Nacchio*,  555 F.3d 1234, 1241 (10th Cir. 2009) (citations omitted).

> [A]s to the kinds of factors that might bear on a judge's gatekeeping determination, the Supreme Court has suggested that a court consider: (1) whether a theory has been or can be tested or falsified, (2) whether the theory or technique has been subject to peer review and publication, (3) whether there are known or potential rates of error with regard to specific techniques, and (4) whether the

4

theory or approach has "general acceptance." The Court has made clear, however, that this list is neither definitive nor exhaustive and that a trial judge has wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability. While these factors are most relevant in the context of a new and novel scientific theory-asking if it has been tested, subjected to peer review and publication, etc.-they do provide examples of the general kinds of issues a trial court need probe in light of its purpose of ensuring that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Failure to consider one, or even any, of these factors, albeit suggestive, will not be dispositive of a district court's failure to fulfill its gatekeeping role because that role depends on the underlying factual circumstances of the particular case.

*Bitler v. A.O. Smith Corp.*,  400 F.3d 1227, 1232 (10th Cir. 2004) (citations omitted).

**DISCUSSION**                                                                                          t

Based on Dr. Withrow's testimony during the *Daubert* hearing regarding his background and qualifications, the Court finds that Dr. Withrow is generally qualified by knowledge, skill, experience, training and education to offer opinions relating to the topic of  racially selective law enforcement.

Rule 702 also requires that an expert base his opinions on the facts of the case.  On cross examination by Plaintiff's counsel and in response to questioning by the Court, it became apparent that Dr. Withrow has not familiarized himself with the basic facts of this case. On the critical issue of whether commercial motor vehicles passing through the POE are selected for inspections on a genuinely random basis (as opposed to a racially selective basis),  Dr. Withrow simply relied on defense counsel's assertion that the selection process was random.[2]  He conceded that he did not independently verify this critical assumption. Dr. Withrow has never been to the POE to observe its operation. He did not interview any of the Defendants in the case and has not received any information from the Department of Public Safety on how the "random" selection process at the POE works.  He did not request and has not reviewed large portions of  the discovery generated in this case, including the transcripts of  Plaintiff's deposition and the depositions of  Department of Public Safety officers-Defendants taken in this

---

[2]

During the *Daubert* hearing, Dr. Withrow testified that "I'm almost positive I was told by Miss Rogers when I asked the question 'How do they decide who to stop?' and she said 'it's a random process.'"  [Tr. April 4, 2011 at 12:45:00]

case.  He did not review  Defendants' answers to  interrogatories.  Dr. Withrow's derelictions in
failing to inform himself about the facts of this case are especially troubling in view of the
following statement in his expert report:  "A thorough understanding of the enforcement context
from which a complaint arises is critical for evaluating a racial profiling allegation. Not all
enforcement contexts are the same. . . . In every instance the officer's behavior, motivation and
legal justification for conducting the stop vary in accordance with the enforcement context."
Clearly, Dr. Withrow's investigation of the facts of this case does not provide him with the
requisite "thorough understanding of the enforcement context" required  both Rule 702 and his
own professional standards.  By his testimony at hearing and with respect to this case, he
disclaimed any intention to testify as an expert about the process by which truck traffic is
enforced.

The Court finds that Dr. Withrow's opinions are not based upon sufficient facts or data

specific to *this* case as required by Rule 702.  Accordingly, Dr. Withrow will not be permitted to

offer any opinions that necessarily depend upon an understanding of how the POE operates.

Among other things, this means, of course, that Dr. Withrow is absolutely precluded from

offering an opinion as to whether the MTD or Officer Strain has or has not engaged in racially

selective law enforcement at the POE.

Because Dr. Williams is generally qualified as an expert on racially selective law

enforcement, the Court will allow him to testify subject to strict limitations.  Dr. Withrow will be

permitted to testify to generally accepted scientific principles employed in the study of racially

selective law enforcement, and employing those general principles he may critique Dr.

Williams' study.   Dr. Withrow will not be permitted to offer criticisms that are not backed by

data suggesting that a given factor would actually affect the validity or reliability of Dr.

Williams' conclusions. For example, Dr. Withrow criticizes Dr. Williams' failure to address the

pre-pass system, [Doc. 75-2 at 1] even though Dr. Withrow has no data suggesting that the

percentages of  Black and non-Black truckers using the pre-pass system differs from the

respective percentages of Black and non-Black truckers passing through the POE.  Such

criticisms, therefore, are based on pure speculation.   This type of speculative criticism will not assist the jury sufficiently to justify the use of trial time to present such testimony.

**IT IS THEREFORE HEREBY ORDERED** that Plaintiff's *Motion to Exclude at Trial the Testimony of Brian L. Withrow*. [Doc. 75]  is **granted in part and denied in part.**

So ordered this 13th day of  April, 2011.

_____

M. CHRISTINA ARMIJO
United States District Judge